UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

RICHARD DEAN HENSLEY,

                  Petitioner,                Case No. 1:09-cv-937

v.                                   Honorable Janet T. Neff

BLAINE C. LAFLER,

                  Respondent.
_____/

## REPORT AND RECOMMENDATION

        This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254.  After a jury trial, Petitioner was convicted in the Macomb County Circuit Court of three counts of first-degree criminal sexual conduct (CSC), MICH. COMP. LAWS § 750.520b(1)(b), three counts of second-degree CSC, MICH. COMP. LAWS § 750.520c(1)(b) and two counts of third-degree CSC, MICH. COMP. LAWS § 750.520d(1)(d).  The trial court sentenced Petitioner to concurrent terms of 96 to 240 months' imprisonment for each of Petitioner's three convictions of first-degree CSC and of 48 to 180 months' imprisonment for each of Petitioner's three convictions of second-degree CSC and for each of Petitioner's two convictions of third-degree CSC.

        In his *pro se* petition, Petitioner raises six grounds for relief, as follows:

I.      [PETITIONER'S] CONVICTION MUST BE REVERSED BECAUSE HE WAS DENIED HIS DUE PROCESS RIGHT TO A FAIR TRIAL WHEN THE TRIAL COURT ADMITTED UNDULY PREJUDICIAL EVIDENCE OF OTHER BAD ACTS, SPECIFICALLY HIS ALLEGED FORCED SEXUAL ENCOUNTER WITH AMANDA DAVIS.

II.   MCL 768.27A CONFLICTS WITH MRE 404(B) AND VIOLATES THE MICHIGAN SUPREME COURT'S CONSTITUTIONAL POWER TO ESTABLISH, MODIFY, AMEND AND SIMPLIFY THE PRACTICE AND PROCEDUR[E] IN ALL COURTS OF THIS STATE.

III.   MCL 768.27A IS AN UNCONSTITUTIONAL EX POST FACTO LAW VIOLATING US CONST, ART 1, § 10, BECAUSE IT ALLOWED THE STATE TO CONVICT [PETITIONER] OF CSC ON LESS OR DIFFERENT TESTIMONY THAN THE RULES OF EVIDENCE REQUIRED AT THE TIME OF THE ALLEGED COMMISSION OF THE OFFENSE.

IV.   [PETITIONER] WAS DENIED A FAIR TRIAL BY THE INTRODUCTION OF EXPERT TESTIMONY THAT DID NOT QUALIFY UNDER MRE 702 OR MRE 703.

V.   MUST [PETITIONER'S] CONVICTION BE REVERSED BECAUSE HE WAS DENIED HIS DUE PROCESS RIGHT TO A FAIR TRIAL WHEN THE TRIAL COURT DISCLOSED THE ERRON[E]OUS DECLARATION THAT [PETITIONER] HAD PLED GUILTY TO ALL CHARGES IN THE PRESENCE OF THE ENTIRE JURY PANEL?

VI.   MUST [PETITIONER'S] CONVICTION BE REVERSED BECAUSE HE WAS DENIED A FAIR TRIAL WHEN INADMISSIBLE EVIDENCE WAS DISCLOSED IN FRONT OF THE JURY BY THE PROSECUTOR?

(Pet., docket #1, Page ID##6, 8, 10, 11, 13.)  Respondent filed an answer to the petition (docket #7) stating that the grounds should be denied because they are procedurally defaulted, noncognizable state law claims and/or lack merit.  Upon review and applying the AEDPA standards, I find that grounds one, two, four, five and six are noncognizable state law claims that lack merit, and ground three is without merit.  Accordingly, I recommend that the petition be denied.

**Procedural History**

A.   **Trial Court Proceedings**

The state prosecution arose from allegations that Petitioner had sexual relations with his biological daughter, Amanda Hensley (AH), and aided and abetted AH in the sexual assault of

AH's friend, Amanda Davis (AD).  At the preliminary examination, Petitioner was bound over on twelve counts of CSC. (Prelim. Examination, 4, 86-88, docket #10.)  The twelve counts included six counts of first-degree CSC, three counts of second-degree CSC and three counts of third-degree CSC.  Four of the first-degree CSC counts relate to events that allegedly involved AH, specifically three claims of penile/vaginal penetration (counts one to three) and one claim of cunnilingus (count four).  The other two first-degree CSC counts allege that Petitioner, in Armada, Michigan, aided and abetted AH in engaging in cunnilingus of AD (count eleven) and the digital penetration of AD (count twelve).  The three counts of second-degree CSC relate to an alleged sexual contact with AH that occurred in St. Clair Shores, Michigan (counts eight, nine and ten).  The three counts of third-degree CSC relate to alleged sexual contact with AH that occurred in Armada, specifically two claims of penile/vaginal penetration (counts five and seven) and one claim of cunnilingus (count six).  (*See* July 22, 2008 Mich. Ct. App. Op. (MCOA Op.) at 1, docket #30; May 16, 2006 Trial Tr., 117-125, docket #26.)  Petitioner was tried before a jury beginning May 2, 1996, and concluding on May 19, 1996.

This Court will accept as accurate Petitioner's version of the facts and the transcript references for the trial as follows:

Amanda Hensley [] stated that her date of birth was December 4, 1987.  In high school[,] she was an honor student and was involved in several extracurricular activities.  [Petitioner] was her father.  Her parents divorced when she was two.  At age six, she came to live with [Petitioner], his wife Sue - who became her surrogate mother, and their twin daughters, Erin and Megan.  She stated that she adored her father, who became a best friend, and that at age 14 she began to have sex with him - first at their home in St. Clair Shores and continuing after their move to Armada.  At first, he would touch her beneath her clothes.  Later, they engaged in intercourse, [and] oral and anal sex.  At first[,] it was occasional.  Eventually it occurred 2 to 3 times a week.  She described his penis as having a bulging vein.  After moving to Armada, living accommodations made the encounters less frequent.  Later, her friend

Amanda Davis came to live with them.  According to complainant[,] [Petitioner] gave Davis medication which would cause her to sleep and, on five occasions, directed [Amanda Hensley] to perform oral sex on or digitally penetrate the girl.  She stated that she became mad at her father after learning that he was having sex with Davis.  In April, 2005, after the two Amandas reported this information to a teacher, Child Protective Services became involved.  Both were removed from the house and she began to live with Davis' family.  She denied instigating the charges in response to [Petitioner]'s cancellation of her cellular telephone, driver's license, bank account or plans to study in Argentina.  Following the preliminary examination, after speaking with the prosecutor and her biological mother and reading medical journals, she was able to provide a description of [Petitioner]'s penis.  She acknowledged that she received sex education in school and that she never underwent a medical examination.  (T3 7-78, 85-223; T4 8-109, 127-177; T5 14-71).

Amanda Davis stated that in mid February, 2005, at the age of seventeen, she moved in with the Hensley family in Armada after being kicked out of her house for stealing a ring from her mother.  She lived with them for 2 ½ months, sharing Amanda Hensley's second floor bedroom.  The twins shared a room on the same floor.  [Petitioner] and his wife shared a bedroom on the main floor.  She recounted [the] day she and [Petitioner] were home alone watching <u>Sex in the City</u>.  According to Davis, [Petitioner] sat next to her, told her that he and his wife had grown apart and that he liked young girls, and began to rub the inside of her leg and her shoulders.  When the show concluded, she changed the channel to watch music videos.  He pulled her off the couch and began to dance with her.  He then sat on the couch and attempted to seat her on his lap.  She pulled away and the incident concluded.  She also recounted another occasion when he picked her up from work and gave her a notebook and told her to read a passage expressing sadness about his father's health and asking to hold and kiss her.  She stated that she declined, but that ten minutes later he pulled over, exposed himself and attempted to force her to perform fellatio.  When she refused, he stopped the car, led her to a grassy area and [] they had intercourse.  Afterwards, they reentered the car and returned home, where he apologized for hurting her but assured her that the ne[x]t time would be more pleasurable.  She also recounted incidents of kissing and hugging.  Davis said nothing about it until a year later, when she told her mother, Hannah Debain, who reported it to the police.  She and Amanda Hensley were then removed from the Hensley house by Child Protective Services.  Both went to live with Davis' family.  (T5 72-151, 158-265; T6 9-51).

Angela Franklin is a Child Protective Services worker for the State of Michigan.  In that capacity[,] she investigated referrals made regarding [Petitioner] involving Davis and complainant.  She interviewed all three.  [Petitioner] denied making any sexual advances to either, stating that Davis hugged him to console him for the loss of his father.  He confirmed placing limits on her computer, television

and telephone usage and voiced his concern about her interest in his jewelry box. As to his daughter, [Petitioner] stated that he could not locate her and thought she may have run away. For that reason[,] he terminated her cellular telephone service. He was financially unable to pay for her to study in Argentina. Franklin recommended that both girls live with their respective mothers. She did not recommend physical examinations because there was no allegation of abuse. (T6 53-132).

Leo Niffeler is a clinical social worker employed at Eastwood Clinics. He is a senior therapist with a speciality in interpersonal violence, working people who have been either the victims or perpetrators of abuse, primarily sexual abuse, mainly adult offenders. He did not interview the complainant or any of the witnesses in this case, receiving only a brief overview by the prosecutor. Niffeler was qualified as an expert in child sexual abuse victims and/or offenders. (T6 134-150).

Niffeler stated that he never met or evaluated any of the parties or reviewed any of the reports, transcripts or interviews in this matter. He testified that secrecy is one of the hallmarks of a father/daughter sexual relationship because "there's an understanding that the behaviors are not consistent with the norms of society. The offenders are aware of the fact that they're committing a crime and they're not about to publicize that. So the secrecy is an integral part of that whole dynamic." He spoke of a "trauma bond[,]" adding that "[t]he perpetrator and the victim develop a relationship out of mutually dependent and dysfunctional needs." Disclosure can occur in a variety of ways, often times by accidental discovery by a third party. In some instances[,] it occurs where the offender breaks a promise or agreement and the victim then feels a sense of outrage. Typically, not everything is disclosed at once. He noted a high probability that a person undergoing such trauma would act out in some fashion, but that Amanda's high grades, athletics, employment and close outside relationships could be inconsistent with such trauma. He noted a higher probability that a 14 to 17 year old would disclose all at once rather than in a piecemeal fashion. Niffel[]er professed little faith in child sexual abuse accommodation syndrome, cited a number of reasons, including anger, as catalysts for making a false report, and that a healthy relationship with other family members would militate against being tricked into doing something wrong. (T6 152-239).

Armada Police Officer Orrin Shoemaker stated that on April 28, 2005 he and Officer Sharp responded to a criminal sexual conduct report from the high school. They interviewed Amanda Davis, who was evasive and did not want to proceed. In June, he was contacted by Hanna Debain regarding [Petitioner] and complainant and received from complainant a written statement indicating that she had intercourse and fellatio with [Petitioner], which had been ongoing since 2002. He filed a report but made no effort to collect any physical evidence. Pursuant to a warrant, he photographed [Petitioner]'s penis for identification. He noted that it had a bulging vein. (T7 7-30, 40-79).

Armada Police Officer Darrell Fisher stated that on April 30, 2005 [Petitioner] and his wife, Suanne, came to the Armada Police Department to report that Amanda Hensley and Amanda Davis had run away.  Fisher was aware that Child Protective Services had removed the girls from the house.  He did not advise [Petitioner] of the ongo[i]ng investigation.  (T7 82-112).

St. Clair Shores Police Officer Gary Crandall stated that on June 27, 2005 he received a call from Officer Shoemaker of the Armada Police Department and faxes from Angela Franklin of the Department of Social Services regarding allegations of sexual abuse which may have occurred in his city.  He was invited to attend the CARE house interview of Amanda Hensley.  He recalled that she indicated instances of touching, fondling, intercourse and oral sex in [a] number of jurisdictions.  H[e] only investigated those which were alleged to have occurred in St[.] Clair Shores.  On July 11, 2005, he interviewed Amanda Hensley about those allegations.  According to Crandall, she stated that she began a personal relationship with her father when she was in the eighth grade, which led to touching one another and then sex, usually at night in her basement bedroom.  (T7 113-160).

Laura Heminger was married to [Petitioner] from 1986 until 1990, and is Amanda Hensley's mother.  Following the divorce, Heminger had physical custody.  [Petitioner] gained custody when Amanda was six.  Heminger stated that on April 29, 2005, she helped Amanda move her possessions from [Petitioner]'s house to that of Hannah Debain, the mother of Amanda Davis.  Following a May 9, 2005 hearing, custody reverted to Heminger.   Amanda was later placed with the Debains.  Heminger described her relationship with [Petitioner] as less than [a]micable.  She agreed that his penis has a bulging vein, and confirmed that she discussed that feature with Amanda.  She never sought medical attention for Amanda despite telling Officer Shoemaker that she would.  (T7 165-227).

The People rested.  (T7 228).  Defense counsel's motion for directed verdict as to counts 2, 3, 4 and 6 was heard and denied.  (T8 3-15).  The defense then presented the following witnesses:

Suanne Hensley stated that she is [Petitioner]'s current wife and the mother of their 14 year old twins.  According to Suanne, Amanda came to live with them at age six.  Suanne's work kept her away from the house from 6:30 a.m. until 4:45 pm.  [Petitioner] worked an afternoon shift, leaving at 2:30 p.m. and returning at 11:30 p.m.  She stated that he was never physical with the children and was never inappropriately dressed in their presence.  Their St. Clair Shores home was a 900 foot ranch.  Crystal Ryan, an 18 year old friend of the family, lived in the basement for ten months.  After Ryan left, Amanda moved to the basement.  Suanne stated that she could hear noises throughout the small house and went to the basement daily to do laundry and for other reasons.  She never heard inappropriate noises or observed

- 6 -

inappropriate behavior between Ryan and [Petitioner] or between Amanda and [Petitioner], and never saw any inappropriate stains on Amanda's bedding. In February, 2005, after moving to Armada, Davis came to live with them. During that time, Davis inappropriately used the computer, watched inappropriate shows on television, stole jewelry and became a bad influence on Amanda, whose argumentative behavior caused Suanne and [Petitioner] to cancel plans for her to study in Argentina. In April, 2005[,] [Petitioner] was with his ailing father. On April 29, 2005, they returned from the funeral to find that both girls had moved out. After making a missing person report[,] they learned of the Protective Services investigation. (T8 17-134).

Robert Wilcox stated that he was a neighbor of the Hensleys in Armada. . . . He stated that he never observed any inappropriate behavior involving [Petitioner] and [either] of the girls. (T8 135-145).

Megan Hensley is a daughter of [Petitioner] and Suanne Hensley and half sister of Amanda Hensley. She described [Petitioner] as a good father and [b]efore Davis moved in, complainant was quiet, participated in family even[t]s and followed the house rules. After Davis moved in, Megan noticed a change in her sister. She showed more skin in her clothing and seemed to care less about chores and family events. She never witnessed [Petitioner] dress inappropriately around the house or any inappropriate behavior between [Petitioner] and either Amanda. (T8 148-165).

Erin Hensley is the twin sister of Megan Hensley. Amanda Davis lived with them for four months. During that time, she slept in Amanda Hensley's room, which was across the hall from the room she shared with Megan. According to Erin, the three sisters were treated no differently. She did notice changes in her older sister after Davis moved in, such as wearing more revealing clothing, becoming more argumentative and inappropriate use of the computer and television. She never witnessed any inappropriate behavior between Appellant and either Amanda[.] (T8 167-184).

Sandra Jacob is [Petitioner]'s mother. She lives nine houses away from [Petitioner]'s Armada home. She described her relationship with complainant as close. That relationship changed when Davis moved in. She became more distant and attended fewer family events. Jacob never witnessed [Petitioner] dress inappropriately or any inappropriate behavior between [Petitioner] and either Amanda . . . . (T8 185-202).

Crystal Thomas stated that in 2000, she was eighteen years old and needed a place to live. [Petitioner] and his wife allowed her to stay with them in their St. Clair Shores home. She remained with them for six to eight months. During that time, they helped her find a job and further her education. While there, she was

required to follow house rules. During that time, she never saw [Petitioner] behave in an inappropriate manner with her or any of his children. (T8 205-220).

Dr. Alan Katsimpalis stated that he is the principal of the Maple Lane Elementary School in the Macomb Intermediate School District. [Petitioner] was a custodian at his building for several years. He knows complainant through [Petitioner]. According to Dr. Katsimpalis, [Petitioner] would arrive [prior] to the start of his afternoon shift to contribute, on his own time, in school activities . . . . [Petitioner] was very proud of his daughter and Katsimpalis' staff helped raise funds for her trip to Argentina. When the trip was cancelled, [Petitioner] returned the funds to the staff. He stated that he would welcome [Petitioner] back to the school with no reservations whatsoever. (T9 5-20).

Karen Nelson is a cousin of Suanne Hensley, and has known [Petitioner for] fifteen years. She is the principal of Tenniswood Elementary School in Clinton Township . . . . As a principal, she is trained to observe [] signs of abuse and neglect [and] saw nothing out of the ordinary. (T9 21-33).

Lisa Minella is Suanne Hensley's sister and a teacher in Grand Rapids. She visits every four to six weeks. She would sleep with either Amanda [or] Megan. From sleeping in the basement of the St. Clair Shores house, she was aware that noises could be heard throughout the house. In Armada, the floors were creaky. She regarded [Petitioner] as an involved father, never saw any inappropriate or abusive behavior and was aware of his support for his daughter's trip to Argentina. (T9 34-53).

Dr. Katherine Okla has a Ph.D. in child and adolescent psychology. She was recognized as an expert in forensic protocol, memory and suggestibility, as well as child development and linguistics. She reviewed police reports, preliminary examination testimony, statements made to the police by Amanda Hensley, Amanda Davis and Laura Heminger and protective services investigative report summar[ies] to provide some input about potential influences on disclosure to make some suggestions about potential sources of influence on memory in reporting past events. She also reviewed the trial testimony of Leo Niffeler. The purpose of her review was to provide information about the way that the disclosure was made and how interviewing techniques work. Specifically, she was looking for hints that somebody was coaching or telling or insinuating that some particular response should be given . . . . (T9 55-147).

Finally, [Petitioner] testified that he never inappropriately touched his daughter or Amanda Davis. He stated that Amanda's mother, Laura Heminger, initially received custody in their 1990 divorce. At Heminger's request, that changed in 1993 or 1994, when Amanda was six. Before his arrest[,] he was an active

participant in the lives of his three children and worked as a school custodian,  first on the afternoon shift before switching to days so that he [was] involved with his children after school.  He described his sex life with Suanne Hensley, his second wife, as active and satisfying.  [Petitioner] stated that he and Suanne treated all of the children equally and all were required to do chores and follow household rules of behavior.  There were no issues before Amanda Davis came to live with them in February, 2005.  Davis routinely violated telephone and internet rules.  In April, 2005, his father became seriously ill, which caused him to spend much of the time in Middleton, some 2 ½ hours away from home.  He denied ever giving Davis drugs or making any sexual advances toward her.  On April 29, 2005, he attended his father's funeral.  Amanda Hensley had an academic function in Grand Rapids.  When he returned, both Amandas had moved out.  He attempted to locate his daughter and report[ed] her as a runaway.  He was told by the police that because she was seventeen[,] they could take no action.  He gave reasons for cancellation of his daughter's driver's license, telephone and trip to Argentina which were not related to the criminal allegations and stated that he cooperated with the Family [I]ndependence Agency investigation.  (T9 148-213.)

(Def.-Appellant's Br. on Appeal at 2-9, docket #30.)

After three days of deliberations, on May 19, 2006, the jury found Petitioner guilty of three counts of first-degree CSC (counts one, two and three), three counts of second-degree CSC (counts eight, nine and ten) and two counts of third-degree CSC (counts five and seven).  The jury acquitted Petitioner of three counts of first-degree CSC (counts four, eleven and twelve) and one count of third-degree CSC (count six). (May 19, 2006 Trial Tr. XI, 3-5, docket #28.)  On June 28, 2006, the trial court sentenced Petitioner to concurrent terms of 96 to 240 months' imprisonment for each of his three first-degree CSC convictions and of 48 to 180 months' imprisonment for each of his three second-degree CSC convictions and for each of his two third-degree CSC convictions. (June 28, 2006 Sentencing Tr., 60, 61, 63, docket #29.)

## B.    Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals.  His brief, which was filed by counsel on February 7, 2007, raised grounds I through IV of his application for habeas

corpus relief.  (*See* Def.-Appellant's Br. on Appeal, docket #30.)  Petitioner also filed a supplemental

brief on appeal raising grounds V and VI of his application for habeas corpus relief.  (*See id.*)  By

unpublished opinion dated July 22, 2008, the Michigan Court of Appeals rejected all appellate

arguments and affirmed Petitioner's convictions and sentences.  (*See* MCOA Op. at 2, docket #30.)

Petitioner filed a *pro per* application for leave to appeal to the Michigan Supreme

Court.  Petitioner raised the same six claims raised before and rejected by the Michigan Court of

Appeals.  By order entered June 10, 2009, the Michigan Supreme Court denied his application for

leave to appeal because it was not persuaded that the questions presented should be reviewed.  (*See*

June 10, 2009 Mich. Ord., docket #31.)[1]

## **Standard of Review**

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB.

L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The

AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect

to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  An application for

writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot

be granted with respect to any claim that was adjudicated on the merits in state court unless the

adjudication:   "(1) resulted in a decision that was contrary to, or involved an unreasonable

application of, clearly established federal law as determined by the Supreme Court of the United

States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts

in light of the evidence presented in the state court proceeding."   28 U.S.C. § 2254(d).

---

[1]Justice Kelley dissented for the reasons set forth in her dissenting opinion in *People v. Kou Xiong*, 483 Mich. 951, 952 (Mich. 2009).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). The inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001); *see also Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411;

*accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Id.* at 410.

Where the state appellate court has issued a summary affirmance, it is presumed to have been made on the merits, and a federal court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. *See Harrington v. Richter*, 131 S. Ct. 770, 784 (2011). However, where other circumstances indicate that the state court has not addressed the merits of a claim, the court conducts *de novo* review. *See Richter*, 131 S. Ct. at 785 (noting that the presumption that the state-court's decision was on the merits "may be overcome when there is reason to think some other explanation for the state court's decision is more likely"); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

### Discussion

**A.    Other Bad Acts**

In his first ground for habeas corpus relief, Petitioner argues the trial court wrongly

admitted evidence under MICH. COMP. LAWS § 768.27a that Petitioner forced AD to engage in sexual

intercourse with him.[2]  The Michigan Court of Appeals addressed the issue as follows:

> [Petitioner] first argues that the trial court abused its discretion by allowing
> testimony under MCL 768.27a that defendant forcibly raped AD.  The trial court's
> decision to admit evidence is reviewed for an abuse of discretion.  *People v Hine*,
> 467 Mich 242, 250, 650 NW2d 659 (2002).  Questions of law are considered de novo
> on appeal.  *People v AD*, 468 Mich 77, 79, 658 NW2d 800 (2003).
>
> [M]RE 404(b) generally governs admission of evidence of bad acts.  It provides:
>
>> (1) Evidence of other crimes, wrongs, or acts is not admissible
>> to prove the character of a person in order to show action in
>> conformity therewith.  It may, however, be admissible for other
>> purposes, such as proof of motive, opportunity, intent, preparation,
>> scheme, plan, or system in doing an act, knowledge, identity, or
>> absence of mistake or accident when the same is material, whether
>> such other crimes, wrongs, or acts are contemporaneous with, or prior
>> or subsequent to the conduct at issue in the case.
>
> Because [Petitioner's] charges involve a sexual offense against a minor, MCL
> 768.27a(1) is applicable, which provides in relevant part, that:
>
>> Notwithstanding [MCL 768.27] in a criminal case in which the
>> defendant is accused of committing a listed offense against a minor,
>> evidence that the defendant committed another listed offense against
>> a minor is admissible and may be considered for its bearing on any
>> matter to which it is relevant.
>
> "In cases involving the sexual abuse of minors, MCL 768.27a now allows the
> admission of other-acts evidence to demonstrate the likelihood of a defendant's
> criminal sexual behavior toward other minors."  *People v Pattison*, 276 Mich App
> 613, 621, 741 NW2d 558 (2007).  However, in applying MCL 768.27a(1) courts
> must nonetheless "take seriously their responsibility to weigh the probative value of

---

[2]Petitioner was not tried for forcing AD to engage in sexual intercourse with him.

the evidence against its undue prejudicial effect in each case before admitting the evidence." *Id.* at 621.

Initially, we note that [Petitioner] cedes that much of AD's testimony in regard to sexual contact was relevant under MRE 404(b) to determine motive and intent. [Petitioner's] contention is essentially limited to AD's testimony that [Petitioner] forced AD to perform fellatio and submit to sexual intercourse. The prosecution responds by arguing that AD's testimony that [Petitioner] forced himself on her was admissible under MRE 404b to prove that defendant had motive and intent to aid and abet AH in sexually molesting AD (counts 11 and 12).

We agree that evidence that [Petitioner] forced AD to perform fellatio and submit to sexual intercourse would be admissible to establish his motive to achieve sexual contact with AD on another occasion. The evidence tended to show more than [Petitioner's] propensity to sexually engage female minors that lived in his home; it showed that he had a specific sexual interest in AD, which provided the motive for the alleged sexual assaults involving AH. The evidence was properly admitted for that purpose. See *People v Watson*, 245 Mich App 572, 579–580, 629 NW2d 411 (2001).

(MCOA Op. at 2-3) (footnote omitted).

To the extent Petitioner raises a claim under MICH. COMP. LAWS § 768.27a and Michigan Rules of Evidence 404(b), his claim is not cognizable on habeas review. The extraordinary remedy of habeas corpus lies only for a violation of the Constitution. 28 U.S.C. § 2254(a). As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Id.* at 67-68. Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68.

State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to

be ranked as fundamental. *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). This approach accords the state courts wide latitude in ruling on evidentiary matters. *Seymour*, 224 F.3d at 552. Further, under the AEDPA, the court may not grant relief if it would have decided the evidentiary question differently. The court may only grant relief if Petitioner is able to show that the state court's evidentiary ruling was in conflict with a decision reached by the Supreme Court on a question of law or if the state court decided the evidentiary issue differently than the Supreme Court did on a set of materially indistinguishable facts. *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000).

Petitioner has not met this difficult standard. There is no clearly established Supreme Court precedent holding that a state court violates the Due Process Clause by permitting propensity evidence in the form of other bad acts evidence. In *Estelle*, the Supreme Court declined to hold that the admission of prior acts evidence violated due process. *Estelle*, 502 U.S. at 75. The Court stated in a footnote that, because it need not reach the issue, it expressed no opinion as to whether a state law would violate due process if it permitted the use of prior crimes evidence to show propensity to commit a charged crime. *Id.* at 75 n.5. While the Supreme Court has addressed whether prior acts testimony is permissible under the Federal Rules of Evidence, *see Old Chief v. United States*, 519 U.S. 172 (1997); *Huddleston v. United States*, 485 U.S. 681 (1988), it has not explicitly addressed the issue in constitutional terms. The Sixth Circuit has also found that "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Bugh*, 329 F.3d at 512.

- 15 -

Further, the trial court specifically gave the jury a limiting instruction on two occasions regarding bad acts testimony:

The trial court's limiting instructions in regard to AD's testimony prevented the jury from considering AD's testimony for an improper purpose. Specifically, during the first day of testimony, AH began to testify that [Petitioner] had commented to her that he had raped AD. Defense counsel interjected, the trial court excused the jury, and the trial court and counsel discussed an instruction in regard to [Petitioner's] uncharged crimes. The trial court then instructed the jury that,

> you're about to hear some evidence from this point forward regarding [] AD, for which defendant has not been charged with—having violated any laws of the state of Michigan or for the crimes that he's not on trial for today. If you believe this evidence, you must be very careful . . . only to consider it for certain purposes. You must not—you may—may only think about whether the evidence tends to show that defendant specifically meant to commit the crime of criminal sexual conduct, that defendant acted purposefully, that is not by mistake or accident or because he misjudged the situation, that defendant used a plan, scheme, or characteristic scheme that he has used before or since, or to explain the behavior of the victim.

> You must not consider the evidence that you're about to hear for any other purpose. For example, you must not decide that it shows that defendant is a bad person or that he is likely to commit crimes. You must not convict defendant here because you think he is guilty of other bad conduct. All the evidence must convince you, beyond a reasonable doubt, that the defendant committed the alleged crime or you must find him not guilty.

* * *

After closing arguments, the trial court reiterated to the jury that:

> You've heard evidence that was introduced to show that defendant committed crimes for which he was not on trial. If you believe this evidence you must be very careful to consider it for certain purposes. You may only think about whether this evidence tends to show that the defendant specifically meant to commit the crime of criminal sexual conduct, that the defendant acted purposefully, that is not by mistake or accident or because he misjudged the situation. That the defendant used a plan, scheme, or

characteristic scheme that he's used before or since, or to explain the behavior of the victim. You must not consider this evidence for any other purpose. For example, you must not decide that it shows that the defendant is a bad person or that he is likely to commit crimes. You must not convict the defendant here because you think he is guilty of other bad conduct. All the evidence must convince you, beyond a reasonable doubt, that the defendant committed the alleged crime or you must find him not guilty.

Here, the evidence was admissible under MCL 768.27a to "demonstrate the likelihood of a defendant's criminal sexual behavior toward other minors." *Pattison, supra*. The trial court did not simply allow the jury to consider evidence of [Petitioner's] bad acts for any purpose, but specifically instructed the jury, on two occasions, on the proper use of the evidence. Thus, in applying MCL 768.27a(1) the trial court took seriously its responsibility "to weigh the probative value of the evidence against its undue prejudicial effect in each case before admitting the evidence." *Id.* at 621. We therefore conclude that the trial court properly admitted the testimony relating to an uncharged sexual assault by [Petitioner] against AD.

(MCOA Op. at 3-5, docket #30.) There is no reason to believe that the jury was unable to follow the trial court's instructions. Because the admission of other bad acts is not constitutionally barred, and the trial court limited the evidence and provided two appropriate jury instructions, admission of the other bad acts evidence was not fundamentally unfair. Accordingly, the Michigan Court of Appeals' decision was neither contrary to nor an unreasonable application of Supreme Court precedent.

## B.      Separation of Powers

In his second ground for habeas corpus relief, Petitioner argues that the Michigan Legislature violated the Michigan Constitution by enacting a law, MICH. COMP. LAWS § 768.27a, that conflicts with Michigan Rules of Evidence 404(b). When a defendant is charged with criminal sexual conduct against a minor, MICH. COMP. LAWS § 768.27a allows prosecutors to introduce evidence of a defendant's uncharged sexual offenses against minors without having to justify admissibility of the evidence under Michigan Rules of Evidence 404(b). *See* MICH. COMP. LAWS

§ 768.27a; MICH. RULES OF EVIDENCE 404(b).  Therefore, it allows evidence that previously would

have been inadmissible.  Petitioner contends that the Michigan Legislature circumvented the powers

of the Michigan Supreme Court by establishing rules for the administration of the Michigan state

courts in violation of the Michigan Constitution.

The Michigan Court of Appeals analyzed the issue as follows:

[Petitioner] next argues that the MCL 768.27a violates the Michigan
Constitution because it amounts to legislative intrusion on the province of our
Supreme Court under Const. 1963, art 6, § 5, to establish rules of practice and
procedure for the administration of our state's courts.

This Court expressly decided this exact legal issue in *Pattison supra*, at
619–620, stating:

We agree that the Legislature may not enact a rule that is
purely procedural, i.e., one that is not backed by any clearly
identifiable policy consideration other than the administration of
judicial functions.  However, rules of evidence are not always purely
procedural, and may have legislative policy considerations as their
primary concern.

In this case, MCL 768.27a is a substantive rule of evidence
because it does not principally regulate the operation or
administration of the courts.  Instead, it reflects the Legislature's
policy decision that, in certain cases, juries should have the
opportunity to weigh a defendant's behavioral history and view the
case's facts in the larger context that the defendant's background
affords.  Naturally, a full and complete picture of a defendant's
history will tend to shed light on the likelihood that a given crime was
committed.  However, the risk that a defendant would suffer undue
prejudice from the exposition of his or her past misdeeds has led the
judiciary, as a matter of policy, to exclude most of this information
from a jury's consideration.  The decision to enact a statute like MCL
768.27a and to allow this kind of evidence in certain cases reflects a
contrary policy choice, and it is no less a policy choice because it is
contrary to the choice originally made by our courts.  Therefore, MCL
768.27a is substantive in nature, and it does not violate the principles
of separation of powers.  [Citations omitted.]

- 18 -

Following *Pattison,* [Petitioner's] claim must be rejected, MCR 7.215(J)(1).

(MCOA Op. at 5, docket #30.)

Petitioner's separation of powers claim regarding the Michigan Legislature, Michigan Supreme Court and Michigan Constitution sounds in state law. State law issues are not subject to habeas review. *See Estelle*, 502 U.S. at 67-68. Moreover, a state-court determination concerning the separation of powers between the Michigan Legislature and the Michigan Supreme Court can only be the basis for habeas corpus relief if it rendered the trial so "fundamentally unfair" so that it deprives a defendant of due process. *Seymour*, 224 F.3d at 552. Petitioner has not met this difficult standard. Accordingly, Petitioner is not entitled to habeas corpus relief on his second ground for habeas corpus relief.

### C.   *Ex Post Facto* **Clause**

In his third ground for habeas corpus relief, Petitioner argues that MICH. COMP. LAWS § 768.27a violates the *Ex Post Facto* Clause because the alleged sexual abuse by Petitioner occurred before the Michigan statute took effect on January 1, 2006.

The *Ex Post Facto* Clause prohibits a state from passing a law that (1) criminalizes an action done before the law was passed, which was innocent when done, (2) "'aggravates a crime, or makes it greater than it was, when committed,'" (3) "'changes the punishment'" to inflict greater punishment than the law provided when the crime was committed, or (4) "'alters the legal rules of evidence'" so that less or different testimony is required than at the time the offense was committed. *Rogers v. Tennessee*, 532 U.S. 451, 456 (2001) (quoting *Calder v. Bull*, 3 U.S. 386, 390 (1798)). The *Ex Post Facto* Clause, however, provides that it is applicable only to acts of the Legislature, and

- 19 -

"'does not of its own force apply to the Judicial Branch of government.'" *Hooks v. Sheets*, 603 F.3d

316, 320-21 (6th Cir. 2010) (quoting *Rogers*, 532 U.S. at 456) (quotation omitted).  Nevertheless,

the "limitations on ex post facto judicial decisionmaking are inherent in the notion of due process."

*Rogers*, 532 U.S. at 456.  Consequently, the principles of the *Ex Post Facto* Clause apply to the

courts through the Due Process Clause.  *See id.* at 456-57.  For this ground of habeas corpus relief,

the fourth category of *ex post facto* protection is at issue.  *See Rogers*, 532 U.S. at 456.

    The Michigan Court of Appeals rejected Petitioner's *ex post facto* argument under

the Michigan Constitution, stating:

> [Petitioner] next argues that the application of MCL 768.27a violates the Ex
> Post Facto Clause, Const 1963, art 1, § 10, since the alleged abuse occurred before
> the statute took effect on January 1, 2006.

> *Pattison, supra* at 618–619, also addressed this claim, and indicated:

>> Defendant argues that the application of MCL 768.27a in this
>> case violates the Ex Post Facto Clause, Const 1963, art 1, § 10, since
>> most, if not all, of the alleged abuse occurred before the statute took
>> effect on January 1, 2006.  In *Calder v Bull*, 3 US (3 Dall) 386, 390,
>> 1 L Ed 648 (1798), Justice Chase outlined the definition of an "ex
>> post facto law."  His definition included as a fourth category "[e]very
>> law that alters the legal rules of evidence, and receives less, or
>> different, testimony, than the law required at the time of the
>> commission of the offence, in order to convict the offender."  *Id.*

>> When a defendant is charged with a sexual offense against a
>> minor, MCL 768.27a allows prosecutors to introduce evidence of a
>> defendant's uncharged sexual offenses against minors without having
>> to justify their admissibility under MRE 404(b).  In many cases, it
>> allows evidence that previously would have been inadmissible,
>> because it allows what may have been categorized as propensity
>> evidence to be admitted in this limited context.  However, the altered
>> standard does not lower the quantum of proof or value of the evidence
>> needed to convict a defendant.  In this case, for example, defendant

- 20 -

could have been tried and convicted before this statute was enacted solely on the basis of his daughter's proposed testimony. That same testimony, if presented as it appears in the record, remains legally sufficient to support his conviction at his upcoming trial. Therefore, the standard for obtaining a conviction against defendant has not changed, and the application of MCL 768.27a to this case does not violate the Ex Post Facto Clause.

Here, as in *Pattison, supra*, "defendant could have been tried and convicted before this statute was enacted solely on the basis of his daughter's . . . testimony." *Id.* at 619. "That same testimony, if presented as it appears in the record, remains legally sufficient to support his conviction at his . . . trial." Following *Pattison, supra*, [Petitioner's] claim must be rejected, MCR 7.215(J)(1).

(MCOA Op. at 5-6, docket #30.) Although the Michigan Court of Appeals analyzed Petitioner's claim under the Michigan Constitution, *ex post facto* laws are prohibited by both the United States Constitution, U.S. Const, art. I, § 10 ("no state shall . . . pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts . . . ."), and the Michigan Constitution, Const 1963, art 1, § 10 ("no bill of attainder, ex post facto law or law impairing the obligation of contract shall be enacted"). Michigan does not interpret its constitutional provision more expansively than its federal counterpart. *People v. Callon*, 256 Mich.App. 312 (Mich. Ct. App. 2003). Both *Ex Post Facto* Clauses prohibit inflicting a greater punishment for an offense than what the law permitted when the crime was committed. *Id.*

The Supreme Court has held that "[s]tatutes which simply enlarge the class of persons who may be competent to testify in criminal cases" do not offend the *Ex Post Facto* Clause. *Hopt v. Utah*, 110 U.S. 574, 589 (1884); *see also Carmell v. Texas*, 529 U.S. 513, 543 (2000). The *Hopt* Court reasoned that such statutes do not offend the *Ex Post Facto* Clause because:

[T]hey do not attach criminality to any act previously done, and which was innocent when done; nor aggravate any crime theretofore committed; nor provide a greater punishment therefor than was prescribed at the time of its commission; nor do they alter the degree, or lessen the amount or measure, of the proof which was made necessary to conviction when the crime was committed.

. . . Any statutory alteration of the legal rules of evidence which would authorize conviction upon less proof, in amount or degree, than was required when the offense was committed, might, in respect of that offense, be obnoxious to the constitutional inhibition upon ex post facto laws. But alterations which do not increase the punishment, nor change the ingredients of the offense or the ultimate facts necessary to establish guilt, but-leaving untouched the nature of the crime and the amount or degree of proof essential to conviction-only remove existing restrictions upon the competency of certain classes of persons as witnesses, relate to modes of procedure only, in which no one can be said to have a vested right, and which the State upon grounds of public policy, may regulate at pleasure. Such regulations of the mode in which the facts constituting guilty may be placed before the jury, can be made applicable to prosecutions or trials thereafter had, without reference to the date of the commission of the offense charged.

*Hopt*, 110 U.S. at 589-90. In this case, the enactment of MICH. COMP. LAWS § 768.27a simply altered the class of persons eligible to testify. *See id*. Because of the statute, AD could testify about her alleged sexual encounters with Petitioner. (*See* Def.-Appellant's Br. on Appeal at 2-3, docket #30.)

Moreover, the *Carmell* Court noted that rules of evidence generally do not violate the *Ex Post Facto* Clause. "[S]uch rules, by simply permitting evidence to be admitted at trial, do not at all subvert the presumption of innocence, because they do not concern whether the admissible evidence is sufficient to overcome the presumption." *Id.* at 533 n.23. In *Carmell*, the Supreme Court considered whether application of an amended Texas statute violated the *Ex Post Facto* Clause where the amended statute permitted conviction of certain sexual offenses based solely upon the non-corroborated testimony of minor victims. Prior to the amendment, the testimony of minors over

the age of thirteen could not support a conviction unless the testimony was corroborated or the victim had informed another person within six months of the offense.  The petitioner in *Carmell* had been convicted of fifteen counts of criminal sexual conduct.  The petitioner contested several of those convictions because the acts were committed prior to the amendment's enactment, when the victim was a minor over the age of thirteen, and were based upon her uncorroborated testimony.  The *Carmell* Court held that the statute could not be applied to crimes committed before its enactment because it was a law that "alter[ed] the legal rules of evidence, and receives less, or different, testimony than the law required at the time of the commission of the offence, in order to convict the offender." *Id.* at 530.  Under the law in effect at the time the acts were committed, the petitioner was entitled to a judgment of acquittal because the prosecutor produced only the victim's testimony.  The amended law, thus, "changed the quantum of evidence necessary to sustain a conviction." *Id.* "Requiring only the victim's testimony to convict, rather than the victim's testimony plus other corroborating evidence is surely less testimony required to convict." *Id.*  The amended statute, therefore, rendered what had been legally insufficient evidence to support the conviction, legally sufficient.

Unlike the facts of *Carmell*, MICH. COMP. LAWS § 768.27a did not change the amount of evidence required for a conviction.  The enactment of the statute simply altered the class of persons eligible to testify by allowing prosecutors to introduce evidence of a defendant's uncharged sexual offenses against minors.  *See Hopt*, 110 U.S. at 589-90.  The statute allowed for AD's testimony regarding her alleged sexual encounters with Petitioner.  *See also Bean v. Ludwick*, No. 05-70361, 2005 WL 3334715, at *6 (E.D. Mich. Dec. 8, 2005) (altering the class of person eligible

- 23 -

to testify did not violate the *Ex Post Facto* Clause).  As a result, the Michigan Court of Appeals'
decision was neither contrary to nor an unreasonable application of Supreme Court precedent.

> **D.     Expert Testimony**

In his fourth ground for habeas corpus relief, Petitioner argues that the trial court
abused its discretion when it allowed Leo Niffeler, a clinical social worker, to testify as an expert
regarding the characteristics of child sexual abuse victims and perpetrators of sexual abuse under
Michigan Rules of Evidence 702 and 703.  Specifically, Petitioner argues that basing the expert's
testimony solely on a description of the case was unreliable.  Petitioner also asserts that Niffeler's
testimony was not the product of established principles or methods.

Although the Michigan Court of Appeals found that Petitioner failed to challenge Leo
Niffeler's testimony as an expert, it reviewed the merits of Petitioner's claims as follows:

> [Petitioner] next argues the trial court abused its discretion in allowing into
> evidence expert testimony from Leo Niffeler, a clinical social worker, in regard to
> child sexual abuse victims and/or perpetrators.  [Petitioner] first claims that "[t]he
> notion that this 'expert' could provide a jury with a detailed psychoanalysis of AH
> . . . based solely on a brief description of the case by the prosecutor—without
> interviewing her or any witness in this case, without reviewing a single report or
> statement and without even observing [AH] testify—is the epitome of junk science."

> Although [Petitioner] claims on appeal that Niffeler's testimony was junk
> science, the following colloquy indicates that defense counsel did not challenge that
> one could be declared an expert in the field of sexual abuse:

> > *The Prosecutor*.  Your honor, I would ask that he be qualified as an
> > expert in the discipline of child in—in sexual abuse relating to
> > child—child sexual abuse and also perpetrators of sexual abuse.

> > *The Court*. [] That you. That—yes, Mr. Thomas?

- 24 -

*Defense Counsel*.  I have no—no argument on that.

In any event, [Petitioner] fails to appreciate that Niffeler was not required to interview, review any report or observe AH.  Our Supreme Court has enunciated general principles regarding the testimony of expert witnesses in child sexual abuse cases:  "(1) an expert may not testify that the sexual abuse occurred, (2) an expert may not vouch for the veracity of a victim, and (3) an expert may not testify whether the defendant is guilty."  *People v Peterson*, 450 Mich 349, 352, 537 NW2d 857 (1995).  However,

> (1) an expert may testify in the prosecution's case in chief regarding typical and relevant symptoms of child sexual abuse for the sole purpose of explaining a victim's specific behavior that might be incorrectly construed by the jury as inconsistent with that of an actual abuse victim, and (2) an expert may testify with regard to the consistencies between the behavior of the particular victim and other victims of child sexual abuse to rebut an attack on the victim's credibility.  [ *Id.* at 352–353.]

Here, Niffeler testified in regard to typical and relevant symptoms of child sexual abuse. There is no requirement that the putative expert familiarize himself with the individual case.  To do so makes it more likely that Niffeler would improperly testify that the sexual abuse occurred, vouch for the veracity of AH and testify whether [Petitioner]  is guilty.  [Petitioner]'s  argument is without merit.

[Petitioner] also maintains that Niffeler's testimony that AH "suffered from and exhibited all the classic manifestations of sexual abuse accommodation syndrome is unacceptable under the general acceptance theory as well as [ *Daubert v Merrell Dow Pharmaceuticals, Inc.*, 509 US 579, 113 S Ct 2786, 125 L Ed 2d 469 (1993)] and [*Kumbo Tire*], and certainly fails the test for admissibility set out in revised MRE 702 and FRE 702."   In short, [Petitioner]  argues that the prosecution failed to show that Niffeler's testimony was the product of reliable principles or methods.

[Petitioner] did not make this argument below, and this issue is not preserved.  *People v Grant*, 445 Mich. 535, 546, 520 NW2d 123 (1994).  Thus, this court reviews this unpreserved for plain error that affected the defendant's substantial rights.  *People v Jones*, 468 Mich 345, 355–356, 662 NW2d 376 (2003).

Under MRE 702, the proponent of expert witness testimony must show that "the data underlying the expert's theories and the methodology by which the expert draws conclusions from the data [are] reliable." *Gilbert v DaimlerChrysler Corp.*, 470 Mich 749, 789, 685 NW2d 391 (2004). Here, Niffeler testified that his testimony regarding typical and relevant symptoms of child sexual abuse was based in part on his education, training and as well as his extensive experience with child sexual abuse victims and/or perpetrators. Niffeler offered unchallenged testimony that he was very familiar with typical and relevant symptoms of child sexual abuse, and this supports the trial court's conclusion that his data is reliable. [Petitioner] has failed to establish plain error affecting his substantial rights.

(MCOA Op. at 6-7, docket #30.)

Petitioner claims that the admission of the expert testimony violated state-court evidentiary rules.[3] Because the extraordinary remedy of habeas corpus lies only for a violation of the Constitution, an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Estelle*, 502 U.S. at 67-68. On the other hand, an evidentiary ruling may violate a petitioner's constitutional right to due process if it is so egregious that it results in a denial of fundamental fairness. *Coleman*, 244 F.3d at 542; *Seymour*, 224 F.3d at 552.

---

[3]Respondent contends that Petitioner's claims are procedurally defaulted. (Resp't's Answer, docket #7, Page ID##41-45.) The U.S. Supreme Court has held that federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits. *See Hudson v. Jones*, 351 F.3d 212, 216 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."), and *Nobles v. Johnson*, 127 F.3d 409, 423-24 (5th Cir. 1997) (deciding against the petitioner on the merits even though the claim was procedurally defaulted)). *See also* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). Where, as here, the procedural default issue raises more questions than the case on the merits, the Court may assume without deciding that there was no procedural default or that Petitioner could show cause and prejudice for that default. *See Cone v. Bell*, 243 F.3d 961, 971 (6th Cir. 2001), *rev'd on other grounds*, *Bell v. Cone*, 535 U.S. 685 (2002); *Binder v. Stegall*, 198 F.3d 177, 178 (6th Cir. 1999).

The admission of Leo Niffeler's testimony as an expert did not deprive Petitioner of a fundamentally fair trial.  Under Michigan Rule of Evidence 702, "a witness qualified as an expert by knowledge, skill, experience, training, or education may testify" regarding "scientific, technical, or other specialized knowledge" if it will assist the fact-finder in understanding the evidence or determining a fact in issue.  Leo Niffeler was questioned extensively about his experience with victims of sexual abuse.  Niffeler testified that he is a clinical social worker at Eastwood Clinics and he has been employed in that position since 1999.  He is licensed in the State of Michigan as a master social worker.  As a social worker, Niffeler stated that he specializes in the treatment of victims of sexual abuse and perpetrators of sexual abuse.  Niffeler also testified that he has worked in the area of sexual abuse for almost seventeen years.  He has received special training from several organizations for victims of sexual abuse.   (Def.-Appellant's Br. on Appeal at 3-4, docket #30); (May 10, 2006 Trial Tr., 134-150, docket #22.)  Niffeler's training and experience with victims of sexual abuse provided him with the specialized knowledge to offer an expert opinion on victim responses to sexual abuse.  Therefore, the admission of Niffeler's testimony clearly did not rise to the level of a due process violation.

Moreover, Petitioner argues that the facts on which Niffeler based his opinion must be entered into evidence under Michigan Rules of Evidence 703.  In fact, Niffeler provided several examples of characteristics of sexual abuse victims to support his opinion.  Niffeler testified that secrecy is one of the hallmarks of a father/daughter sexual relationship because "there's an understanding that the behaviors are not consistent with the norms of society.  The offenders are aware of the fact that they're committing a crime and they're not about to publicize that."  (Def.-Appellant's Br. on Appeal at 4, docket #30).  Niffeler also mentioned that the victim and perpetrator

may develop a relationship out of mutually dependent and dysfunctional needs, i.e., a "trauma bond[]." *Id.* Niffeler finally noted that a 14 to 17 year old would most likely disclose all at once rather than in a piecemeal fashion. *Id.* Once again, the admission of Niffeler's expert testimony failed to rise to a due process violation.

        In summary, the Michigan Court of Appeals' decision was neither contrary to nor an unreasonable application of Supreme Court precedent.

### E.     Preliminary Jury Instructions

        In his fifth ground for habeas corpus relief, Petitioner argues that the trial court erroneously informed the jurors that Petitioner pleaded guilty during preliminary jury instructions.

        The Michigan Court of Appeals rejected Petitioner's argument as follows:

> [Petitioner] next argues in his Rule 11 brief that the trial court committed error requiring reversal in informing prospective jurors that [Petitioner] pleaded guilty to the crimes charged. In its preliminary instructions to prospective jurors the trial court had just read the 12–count Information to the jury when it stated: "Now, as I indicated, the [Petitioner] pled guilty to the charges. You should clearly understand that the Information I have just read to you is not evidence. An Information is read in every criminal trial so the [Petitioner] and the jury can hear the charges." At that point, defense counsel interjected, stating, "[y]our honor, if we could just make a correction. He has not pled guilty to each of the charges." The trial court responded, "I'm sorry, did I say guilty." The trial court then told prospective jurors that, "Oh, I apologize, Not guilty,["] and properly re-read the above instruction.
>
>      The trial court simply misspoke. Further, the trial court informed the jury that it had misspoke, and properly re-read the instruction. Juries are presumed to follow their instructions. *People v Long*, 246 Mich App 582, 588, 633 NW2d 843 (2001). There is no harm shown, defendant has failed to establish error requiring reversal.

(MCOA Op. at 7-8, docket #30.)

        Typically, a claim that a trial court gave an improper jury instruction is not cognizable on habeas review. Instead, Petitioner must show that the erroneous instruction "so infected the entire

trial that the resulting conviction violates due process." *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977). *See also Estelle*, 502 U.S. at 75 (erroneous jury instructions may not serve as the basis for habeas relief unless they have "so infused the trial with unfairness as to deny due process of law"); *Rashad v. Lafler*, 675 F.3d 564, 569 (6th Cir. 2012) (same); *Sanders*, 221 F.3d at 860. If Petitioner fails to meet this burden, he fails to show that the jury instructions were contrary to federal law. *Sanders*, 221 F.3d at 860.

Petitioner wholly fails to meet this difficult standard. The trial court simply misspoke when it said that Petitioner pleaded guilty after reading the 12-count Information during preliminary jury instructions. The court quickly apologized to the jury and corrected itself by re-stating the preliminary jury instruction. Moreover, in its final charge to the jury, the trial court did not make that mistake. The court stated: "[a] person accused of a crime is presumed to be innocent . . . . This presumption continues throughout the trial and entitled the defendant to a verdict of not guilty, unless you are satisfied, beyond a reasonable doubt, that he is guilty." (May 16, 2006 Trial Tr., 108, docket #26.) Because "[a] jury is presumed to follow its instructions," Petitioner cannot show that the trial court's error rendered the trial fundamentally unfair. *Blueford v. Arkansas*, 132 S. Ct. 2044, 2051 (2012) (citing *Weeks v. Angelone*, 528 U.S. 225, 234 (2000)). Accordingly, Petitioner's sixth ground for habeas corpus relief lacks merit.

## F.    Photograph Evidence

In his final ground for habeas corpus relief, Petitioner argues that inadmissible evidence of photographs of Petitioner's penis were erroneously shown to the jury.

As previously stated, the United States Supreme Court has held that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"

such as evidentiary issues. *Estelle*, 502 U.S. at 67–68. The job of a federal court addressing state evidentiary issues is limited to a determination of whether the admission of the evidence at issue violated the petitioner's right to due process. *Id.* An evidentiary ruling may violate a petitioner's constitutional right to due process if it is so egregious that it results in a denial of fundamental fairness. *Coleman*, 244 F.3d at 542; *Seymour*, 224 F.3d at 552.

The Michigan Court of Appeals denied Petitioner's argument regarding the admission of the photograph evidence as follows:

> Lastly, [Petitioner] argues in his rule 11 brief that the prosecutor improperly showed two photographs of [Petitioner]'s penis to the jury. Armada police officer Orrin Paul Shoemaker testified that, based on AH's description of [Petitioner]'s penis, a search warrant was executed on October 19, 2005, to photograph [Petitioner]'s penis. Shoemaker testified that "[t]here was a ridge running [from] the base of [Petitioner's] penis ... to the head of the penis." Apparently, at this time, the prosecutor attempted to admit pictures taken of [Petitioner]'s penis, which the trial court had previously ruled inadmissible. Defense counsel objected to the manner in which the prosecutor handled the pictures and claimed the jury could [see] the inadmissible photos. Defense counsel asked [Petitioner] whether to move for a mistrial but [Petitioner] indicated on the record that he wanted to go forward with the case. The trial court informed the jury to disregard any "flash" of the photograph.

> A defendant tried by jury has a right to a fair and impartial jury. During their deliberations, jurors may only consider the evidence that is presented to them in open court. Where the jury considers extraneous facts not introduced in evidence, this deprives a defendant of his rights of confrontation, cross-examination, and assistance of counsel embodied in the Sixth Amendment.

> In order to establish that the extrinsic influence was error requiring reversal, the defendant must initially prove two points. First, the defendant must prove that the jury was exposed to extraneous influences. Second, the defendant must establish that these extraneous influences created a real and substantial possibility that they could have affected the jury's verdict. [(]*People v Budzyn*, 456 Mich 77, 88–89, 566 NW2d 229 (1997) ([c]itations omitted)[)].

> Here, [Petitioner] cannot meet the two-prong test set forth in *Budzyn, supra* at 89. The record does not indicate that any juror saw the photographs. Further, AH, Shoemaker and [Petitioner]'s former wife testified to the physical characteristics of

[Petitioner]'s penis. We therefore conclude that [Petitioner] has failed to show prejudice resulting from any exposure the jurors had to these photographs. Thus, [Petitioner] has failed to establish error requiring reversal.

(MCOA Op. at 8-9, docket #30.)

The appellate court's conclusion that the photographs of Petitioner's penis were not shown to the jury is entitled to a presumption of correctness. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. A petitioner has the burden of rebutting the presumption by clear and convincing evidence. *Id.* Petitioner has not rebutted the presumption with any evidence, much less clear and convincing evidence. 28 U.S.C. §2254(e)(1). Moreover, the information in the photographs duplicated several witnesses' testimony. AH, Armada police officer Orrin Paul Shoemaker and Petitioner's former wife, Laura Heminger, all testified regarding the physical characteristics of Petitioner's penis. (Def.-Appellant's Br. on Appeal at 2, 4, 5, docket #30.) Because the information in the photographs duplicated information already in evidence from the witnesses' testimony, the photographic evidence did not rise to the level of a due process violation. *See Garrison v. Wolfenbarger*, No. Civ. 04-CV71234DT, 2005 WL 2173630, at *8 (E.D. Mich. Sept. 2, 2005) (jury foreman's visit to the crime scene did not violate the Sixth Amendment when the information duplicated information that was already in evidence.) Accordingly, the Michigan Court of Appeals' decision was not an unreasonable determination of the facts, nor was it contrary to or an unreasonable application of Supreme Court precedent.

<u>Recommended Disposition</u>

For the foregoing reasons, I respectfully recommend that the habeas corpus petition

be denied.


Date:  September 26, 2012                             /s/ Ellen S. Carmody_____
                                                     ELLEN S. CARMODY
                                                     United States Magistrate Judge



<u>NOTICE TO PARTIES</u>

Any objections to this Report and Recommendation must be filed and served within 14 days of
service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections
and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely
objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638
F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).